No. 404 May 13, 2026 497

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CHET THOMAS HAMILTON,
*Defendant-Appellant.*

Linn County Circuit Court
23CR19602, 23CR01186; A182288 (Control), A182289

Keith B. Stein, Judge.

Argued and submitted October 14, 2025.

Francis C. Gieringer, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Peenesh Shah, Assistant Attorney General, argued the cause for respondent. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Solicitor General.

Before Tookey, Presiding Judge, Kamins, Judge, and Jacquot, Judge.

KAMINS, J.

Reversed.

Tookey, P. J., concurring in part, dissenting in part.

**KAMINS, J.**

In this criminal appeal, defendant seeks reversal of a judgment convicting him of felon in possession of a firearm, ORS 166.270(1), and a judgment revoking his probation on the basis of committing that crime. Defendant, a person previously convicted of a felony, relinquished ownership of a rifle by selling it to a pawnshop. The state elected to prosecute defendant under a "constructive possession" theory of the crime. Because the evidence the state relied on does not support a finding that defendant constructively possessed the rifle, we reverse.

When reviewing the denial of a motion for a judgment of acquittal, as here, "we view the evidence in the light most favorable to the state to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Hubbell*, 371 Or 340, 343, 537 P3d 503 (2023). We state the facts in accordance with that legal standard.

Defendant, after being convicted of a felony, moved in with his cousin, Foultner. Prior to the move, and without defendant's knowledge, Foultner had stored defendant's rifle in her gun safe. Only Foultner and her husband knew the combination to the safe, and defendant's probation officer told Foultner that her gun safe was "not a problem." At some point after moving in, defendant asked Foultner if she could help him sell his rifle because he could use the money. She agreed and told him that she had stored the rifle in her gun safe. Foultner retrieved the rifle from her safe and asked defendant if she had the correct firearm. From across the room, defendant identified the rifle as his.

Foultner drove herself and the rifle to a pawnshop, while defendant traveled in a separate car. Foultner carried the rifle into the shop and defendant directed her to hand it to Carroll, a pawnbroker. Foultner placed the rifle on the counter, and asked defendant whether he was "good to go," to which defendant responded, "Yep." Foultner left, and, less than 30 seconds later, Carroll picked up the rifle, examined it, and placed it with her behind the counter, on the opposite side of defendant. Defendant then, without touching the

rifle, finalized its sale to the pawnshop. The entire transaction took approximately 15 minutes, during which time Carroll either held the rifle or stored it behind the counter.

Based on that conduct, the state charged defendant with felon in possession of a firearm, ORS 166.270(1).[1] The state also moved to revoke defendant's probation on the basis of a new crime violation. Upon conclusion of the state's case, defendant requested that the state elect a theory. The state responded that it would elect possession, and that it would not proceed on a theory of ownership. Defendant then moved for a judgment of acquittal, arguing that there was insufficient evidence that he physically possessed the firearm and that he did not have the ability to exercise dominion and control over the rifle. The state responded that, from the moment that Foultner walked away from the firearm and left the pawnshop, approximately 12 minutes elapsed until the sale of the rifle was completed, and during that time defendant was exercising some control over the rifle because he could have changed his mind and walked away with it.

The court denied defendant's motion, reasoning that selling the weapon was "the ultimate expression of possession":

"[Defendant] was the only person who had the right to exercise control over [the rifle]. In addition to that, he did exercise control over it in that he sold the weapon, which is basically the ultimate, in the Court's opinion, the ultimate expression of possession. You are transferring the ownership, the possession of that property from yourself to another person."

The jury found defendant guilty. The court also found defendant in violation of the condition of probation that he obey all laws and revoked his probation. This appeal followed.

On appeal, the parties renew their arguments. Defendant argues that merely having the ability to take the

---

[1] ORS 166.270(1) provides, in full:

"Any person who has been convicted of a felony under the law of this state or any other state, or who has been convicted of a felony under the laws of the Government of the United States, who owns or has in the person's possession or under the person's custody or control any firearm commits the crime of felon in possession of a firearm."

rifle and leave the pawnshop is insufficient evidence of constructive possession. Defendant also argues that the text, context, and legislative history of both ORS 166.270 (the felon-in-possession-of-a-firearm statute) and ORS 161.015 (providing the definition of "possess") show that the legislature did not intend "possession" to include the transfer of property. The state, for its part, responds that defendant exerted sufficient control over the rifle to constitute constructive possession. For the reasons that follow, we agree with defendant.

The question of whether defendant engaged in conduct covered by the "constructive possession" theory of felon in possession is one of statutory interpretation which we resolve by looking at the text, context, and any useful legislative history. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). The ultimate question is: Did the legislature intend defendant's conduct—asking his cousin to take the rifle to the pawnshop and selling it to the pawnbroker—to be included within a "constructive possession" theory for the crime of felon in possession?[2]

The text of ORS 166.270(1) provides, in relevant part:

"Any person who has been convicted of a felony under the law of this state * * *, who owns or has in the person's possession or under the person's custody or control any firearm commits the crime of felon in possession of a firearm."

That statute was first enacted in 1925, Or Laws 1925, ch 260, § 2, "and the acts constituting 'possession,'" *i.e.*, ownership, possession, custody, or control, "under that statute have not changed since." *State v. Casey*, 346 Or 54, 58 n 2, 203 P3d 202 (2009). As mentioned, the state elected to prosecute defendant under a "constructive possession" theory, and not one of ownership, custody, or control. "Possess" is defined by a different statute to mean "to have physical possession or otherwise to exercise dominion or control over property." ORS 161.015(9). That definition incorporates two forms of possession—actual (*i.e.*, "physical") possession and constructive (*i.e.*, "otherwise exercise dominion or control

---

[2] We express no opinion on whether these facts could have successfully supported a prosecution under a different theory, such as "ownership."

over property") possession. *State v. Barger*, 349 Or 553, 559, 247 P3d 17 309, *adh'd to as modified on recons*, 350 Or 233, 253 P3d 1030 (2011). "Control" means "'to exercise restraining or directing influence over.'" *Id.* at 559 (quoting *Webster's Third New Int'l Dictionary* 496 (unabridged ed 2002)). Thus, constructive possession involves some type of restraining or directing influence over property that is distinct from physically possessing it.

Although possession is a "related and often overlapping concept[]" with ownership, custody, and control, *Casey*, 346 Or at 58, we must assume, in the absence of evidence saying otherwise, that the legislature did not intend any words in its statute to be surplusage—thus, possession means something distinct from ownership, custody, and control. *See Marshall v. PricewaterhouseCoopers, LLP*, 371 Or 536, 555-56, 539 P3d 766 (2023) (when the legislature uses different terms in the same statute, "it intended different meanings" unless "more direct evidence of legislative intent" suggests otherwise (internal quotation marks omitted)). In *Casey*, the Supreme Court left open the question of whether the definition of "possess" in ORS 161.015(9) "subsumes every manifestation of the four acts listed in ORS 166.270," the felon-in-possession statute. 346 Or at 59. This case permits us to answer a portion of that question in the negative: constructive possession and ownership are different. That difference becomes clearer when examining the relevant dictionary definitions from the time of the statute's enactment—namely, possession is what permits a person to control property, whereas ownership permits an owner to sell or transfer it. *See Fenimore v. Blachly-Lane County C.E.A.*, 297 Or App 47, 54, 441 P3d 699 (2019) (when interpreting a statute, this court looks to "dictionaries in use at the time the statute was enacted to determine [its] ordinary meaning"); *see also State v. Ziska / Garza*, 355 Or 799, 806, 334 P3d 964 (2014) ("Analysis of the context of a statute may include prior versions of the statute.").

In 1925, "possession" meant the "[a]ct, fact, or condition of a person's having such control of property that he may legally enjoy it to the exclusion of all others having no better right than himself." *Webster's New Int'l Dictionary of the*

*English Language* 1680 (1930). That definition of "possession" also noted that "[w]hat constitutes such possession depends upon the subject matter and the legal system involved; but, in general, all legal systems recognize as having possession him (as a thief) who has actual physical control of a thing and holds it for himself[.]" *Id.* To "own" meant "1. To take or get possession of ; to acquire or appropriate *** 2. To possess; to have or hold as property, appurtenance, or proprium ; to have rightful title to, whether legal or natural; as, to own a house, a title, a prerogative." *Id.* at 1541. An "owner" meant "[o]ne who owns ; a proprietor ; one who has the legal or rightful title, *whether the possessor or not.*" *Id.* (emphasis added). In other words, the 1925 legislature understood possession to relate to one's control and exclusion of others, while ownership was more closely related to having a legal title to property, *regardless* of possession. *See also* 2 *Webster's American Dictionary of the English Language* 224 (1828) (definition of "own") ("To have the legal or rightful title to; to have the exclusive right of possession and use. *** *Men often own land or goods which are not in their possession.*" (Emphasis added.)).

In 1971, the legislature enacted the current statutory definition of "possession" in the Criminal Code: "to have physical possession or otherwise to exercise dominion or control over property." ORS 161.015(9). The legislature did not define or otherwise alter any of the other acts in the felon-in-possession statute. That definition of "possession" "codifie[d] the concepts of actual and constructive possession." *Casey*, 346 Or at 59; *see also* Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 3, 4 (July 1970) ("'[P]ossess' is a term appearing frequently in the draft and has been defined to include the doctrine of constructive possession of property."). In other words, it is our understanding that the 1971 legislature intended to codify the existing common law understanding of constructive possession. *See Montara Owners Ass'n v. La Noue Development, LLC*, 357 Or 333, 341, 353 P3d 563 (2015) ("The context for interpreting a statute's text includes the preexisting common law, and we presume that the legislature was aware of that existing law."). There is nothing in the statutory text, or legislative history, that would indicate a departure from either of those meanings.

That preexisting common law tracks neatly onto the dictionary definitions from the statute's enactment. For example, holding the legal title to property is what gives the owner the right to sell it to another—not possession. *See Singer M. Co. v. Graham*, 8 Or 17, 22, 1879 WL 1191 (1879) (the concept that a seller that had yet to receive full legal title "had no right to sell the property" was "too well settled now to admit of any doubt"); *Ballard v. Burgett*, 40 NY 314, 316, 1869 WL 6504 (1869) ("Possession by a vendor without title, has never been held sufficient to confer a title upon a purchaser from him."). In 1971, "sell" meant "to give up (property) to another for money or other valuable consideration : *hand over or transfer title to* (as goods or real estate) for a price" *Webster's Third New Int'l Dictionary* 2061 (unabridged ed 1971) (emphasis added). Thus, in 1971, the legislature would have understood that selling and transferring property was part of a person's ownership interest, not a possessory one.

Turning to the conduct at issue here, the state contends that there was evidence that defendant exercised control over the hunting rifle by asking his cousin to take it to the pawnshop and by authorizing the sale to the pawnbroker, and there was also evidence that he did so because he wanted to sell the rifle for money. The state also pointed to the pawnbroker's testimony that if defendant had canceled the transaction, she would have given him the rifle, and he would have been free to leave with it. According to the state, that was sufficient evidence of constructive possession. Viewing the evidence in the light most favorable to the state, we conclude that the evidence was insufficient to support a finding of the essential elements of the crime by a rational trier of fact. Specifically, the evidence relied on by the state—defendant identifying his firearm, authorizing the sale, and retaining the ability to cancel the sale—is entirely subsumed within an ownership theory, and does not support a determination that defendant "constructively possessed" the rifle. The trial court relied on that erroneous interpretation as well, emphasizing that defendant's sale of the rifle was the "ultimate" expression of possession.[3]

---

[3] The only evidence that could even arguably fall outside an ownership theory is that defendant confirmed that Foultner selected the correct firearm from her gun

Moreover, on this record, it is not clear that defendant exercised any custody or control over the rifle: Foultner kept the rifle without defendant's knowledge, Foultner stored the rifle in a way that was inaccessible to defendant, Foultner chose when to assist defendant in selling the rifle, Foultner transported the rifle to a pawnshop by herself without defendant in her car, Foultner gave the rifle to the pawnshop employee, the pawnshop employee held on to the rifle during the transaction, and defendant completed the sale without ever touching the rifle.

If the legislature did not intend for an otherwise lawful sale or transfer of ownership to be included within constructive possession, our inquiry ends: No reasonable juror could convict a defendant based on evidence that does not relate to the theory of the crime as charged and argued.

Reversed.[4]

**TOOKEY, P. J.,** concurring in part and dissenting in part.

I agree with the majority that defendant's judgment of conviction for the crime of felon in possession of a firearm (FIP) should be reversed. However, I disagree with the majority's holding that the evidence did not support a determination that defendant constructively possessed the firearm.

As the majority notes, "constructive possession involves some type of restraining or directing influence over property that is distinct from physically possessing it." 349 Or App at 502. Here, when defendant told his cousin that she had the correct firearm, accompanied her to the pawnshop (albeit in a different vehicle), went into the pawnshop with his cousin, told his cousin to hand the rifle to

safe. Merely identifying a firearm that another possesses cannot be enough to show "dominion and control" or "restraining or directing influence." The only reason that identification is relevant at all is because defendant *owned* the firearm—had defendant's cousin brought down the wrong rifle, but defendant mistook it for his own and identified it as such, absent more, no crime would have been committed.

[4] Because defendant's revocation of probation is based solely on his conviction, our disposition—reversal of that conviction—requires reversal of the revocation of probation as well. *State v. McDonald*, 77 Or App 267, 269 n 1, 712 P2d 163 (1986).

the pawnbroker, told the pawnbroker that he was the legal owner of the rifle, remained in the pawnshop after his cousin left, agreed to the price offered for the rifle, and signed the sales contract, then he was engaged in a type of restraining or directing influence over the rifle that was distinct from physically possessing it. In other words, there was evidence that he was exercising dominion and control over the rifle when he sold it.

In my view, the trial court did not err in denying defendant's motion for judgment of acquittal (MJOA) and allowing the jury to decide whether he committed the crime of FIP by selling a rifle he owned.

Because I am not persuaded by defendant's first assignment of error, I address his other assignments. For the reasons explained below, defendant's second through fifth assignments of error, which concern the choice-of-evils defense and the attorney-client privilege, are not persuasive. However, under the sixth assignment, I agree with defendant that the trial court erred in permitting a detective to testify about a legal conclusion and that the error was not harmless. Accordingly, although I would affirm the probation revocation judgment, I would reverse and remand defendant's FIP judgment of conviction because of the error in permitting the detective to testify about a legal conclusion.

## I.   FACTS

In March 2023, defendant was convicted of coercion, identity theft, and tampering with a witness, and he was sentenced to supervised probation. When he was released from custody, defendant stayed with his cousin. Defendant's cousin stored defendant's rifle in her gun safe. Defendant, who was 46, had owned the rifle since he was 17 or 18 years old. Defendant's cousin also stored weapons belonging to defendant's father in her safe, and defendant did not know the combination to the safe.

Defendant told his cousin he wanted to sell the rifle because he was "out of cash." It had come up "a few times" that defendant wanted to sell it. Defendant's cousin confirmed with defendant's father that it was defendant's gun

and that "[h]e can do whatever he likes with it." In April 2023, defendant's cousin took the rifle out of the safe and held it up to defendant from across the room, who confirmed that it was defendant's gun. Defendant did not touch the rifle. Defendant's cousin drove the rifle to a pawnshop and defendant drove there in a separate vehicle. The drive took about 15 minutes. Defendant's cousin carried the rifle into the shop, and defendant told her to hand it to the pawnbroker.

The pawnbroker, who was a licensed gun dealer, checked the rifle to make sure there was no ammunition in it. The pawnbroker asked defendant and his cousin who owned the rifle, and defendant indicated that he was the legal owner. After placing the rifle on the counter, defendant's cousin remained in the store for a brief time, and then she left. Defendant's cousin estimated that she was in the store for less than two minutes, and she did not return to the pawnshop.

The pawnbroker asked defendant how much he hoped to get for the rifle, and she did some research about the gun's value. The pawnbroker consulted with another store employee and the manager about how much to offer for the gun. During the approximately 15 minutes it took to complete the transaction, the pawnbroker either held the rifle or stored it behind the counter. Defendant did not touch the rifle, although it was within his reach for about 30 seconds when it was on the counter. The pawnbroker testified that if defendant had backed out of the transaction, "I would give him the firearm." She explained that it often happens that gun owners are offended at the store's offer because it can be significantly less than what they paid for the firearm, and they are free to leave with it. However, defendant "wanted to get rid of it," and he took the broker's first offer. The broker entered defendant's and the gun's information in her computer system, defendant signed the contract, and he took the cash.

When the broker entered the information into a database, Albany police detective Hatley received an alert that defendant had sold the rifle. After determining that defendant was a felon, the detective went to the pawnshop.

He spoke with the broker, viewed the pawnshop's surveillance video, and he decided to arrest defendant.

The state moved to revoke defendant's probation and separately charged him with the crime of FIP. The indictment charged defendant with owning the firearm or having it in his possession or under his custody or control. *See* ORS 166.270(1). Defendant filed pretrial notice of his intent to raise a choice-of-evils defense. *See* ORS 161.200 (explaining when conduct that would otherwise constitute an offense is justifiable).

At his jury trial on the charge of FIP, the state called several witnesses, including the pawnbroker, defendant's cousin, and the detective who arrested defendant. The detective testified regarding ORS 166.435, which describes how a firearm can be lawfully transferred from one person to another, and the detective indicated that if defendant had contacted the police department about how to dispose of the firearm, the detective would have "cut him a break" because he would have been "trying to do the right thing" in "trying to get rid of [the firearm]."

At the close of the state's case, defendant moved for the state to elect a theory of criminal liability. The state elected to proceed under a theory of constructive possession and indicated that it was "not proceeding on the ownership."[1] In moving for an acquittal, defendant argued that the state had failed to prove that he possessed the rifle, and, even if he possessed it, the state failed to disprove the choiceof-evils defense. The state responded that, "at any point, if [defendant] had just changed his mind, he gets to walk away with it."

The trial court determined that defendant did not have "actual possession of the property" because he "never had physical dominion or control over [the rifle]." However, the trial court determined that a rational juror could conclude that defendant constructively possessed the rifle because he was "the only person who had the right to exercise control over it," and he "did exercise control over it in

---

[1] From my review of the record, it is not evident why the state chose to proceed on a theory of constructive possession rather than ownership.

that he sold the weapon." Regarding defendant's choice-of-evils defense, the trial court determined that it was also a matter for the jury because the jury could find that defendant sold the rifle because he wanted money, and not out of a desire to follow the law.

In his defense, defendant testified that he was unaware of any way to dispose of the rifle other than through a licensed gun dealer. Defendant admitted that he did not ask his probation officer, law enforcement, or an attorney about how to lawfully dispose of the rifle.

After instructing the jury, and while the jury was deliberating, the parties agreed to conduct the probation violation hearing.[2] At the hearing, the prosecutor relied on the evidence presented during the trial of the FIP charge to prove the probation violation, while defendant raised the choice-of-evils defense in response. The trial court determined that the state had shown by a preponderance of the evidence that defendant constructively possessed the rifle and that he took it to the pawnshop because he wanted to be paid for it. The trial court therefore determined that defendant violated the condition of his probation requiring him to obey all laws because he committed the crime of FIP. The jury subsequently found defendant guilty of the same crime.

At a subsequent sentencing hearing, the trial court revoked defendant's probation and sentenced him to 18 months in prison and to a total of 36 months of post-prison supervision (PPS). Then, based on the jury's verdict, the court sentenced defendant to 15 months in prison, with six months of that time to be served consecutive to the revocation sentence, and 24 months of PPS.

## II.   ANALYSIS

In his first and second assignments of error, defendant argues that the trial court erred in denying his MJOAs on constructive possession and the choice-of-evils defense and in determining that he violated his probation by failing to obey all laws. The majority determines that defendant's

_____

[2] I offer no opinion on the practice of conducting the probation violation hearing before the jury had reached a verdict, which is not an issue raised by defendant on appeal.

conduct "is entirely subsumed within an ownership theory" of FIP and does not support a determination that defendant constructively possessed the rifle. 349 Or App at 504. I am not persuaded that defendant's conduct in this case did not amount to constructive possession of the rifle.

A.   *Constructive Possession*

       Preliminarily, I do not agree with the state's contention that defendant failed to preserve the argument about constructive possession. The state elected to proceed on a theory of constructive possession, the trial court understood the parties' arguments to be about constructive possession, and the trial court ruled that a rational juror could conclude that defendant constructively possessed the rifle. That was sufficient to preserve the argument defendant makes on appeal. *See State v. K. J. B.*, 362 Or 777, 790, 416 P3d 291 (2018) ("The purposes of the rule requiring preservation of error are to allow the trial court to consider a contention and correct any error, to allow the opposing party an opportunity to respond to a contention, and to foster a full development of the record." (Internal quotation marks omitted.)).

       Turning to the merits, I first state how I understand the law of constructive possession in relationship to ORS 166.270(1), and then I apply it to the facts. That statute provides in part:

> "Any person who has been convicted of a felony under the law of this state * * *, who owns or has in the person's possession or under the person's custody or control any firearm commits the crime of felon in possession of a firearm."

"Ownership, possession, custody, and control are related and overlapping concepts." *State v. Casey*, 346 Or 54, 58, 203 P3d 202 (2009). As used in ORS 166.270, "possession" has the same meaning as the word "possess" in ORS 161.015(9). *Id.* at 59.

       "Possess" means "to have physical possession or otherwise exercise dominion or control over property." ORS 161.015(9). That definition incorporates two forms of possession—actual and constructive. *State v. Barger*, 349 Or 553, 559, 247 P3d 309, *adh'd to as modified on recons*, 350 Or 233, 253 P3d 1030 (2011); *State v. Fries*, 344 Or 541, 545-46, 185

P3d 453 (2008). The phrase "otherwise exercise dominion or control" in ORS 161.015(9) means constructive possession—exercising dominion or control over property "in some other way" than physically controlling it. *Barger*, 349 Or at 560 (emphasis omitted). "Control" means "'to exercise restraining or directing influence over.'" *Id.* at 559 (quoting *Webster's Third New Int'l Dictionary* 496 (unabridged ed 2002)). "Control" also means "to have power over." *Webster's* at 496. Relevant definitions of "dominion" include "a supremacy in determining and directing the actions of others," "preponderant or overriding influence," "something that is subject to sovereignty or control," and "absolute ownership." *Webster's* at 672.

Thus, "to 'possess' a thing traditionally means to control it, and 'actual possession' and 'constructive possession' are simply different types of control." *Barger*, 349 Or at 559. Constructive possession also encompasses "a 'right' to control an object," where that right must be understood as "something akin to a *legal* right to do so—a concept that is useful in discussing the distinction between 'ownership,' 'possession,' and mere 'custody' of property[.]" *Id.* at 564 (emphasis in original).

Below, the state elected not to proceed on a theory of criminal liability based on defendant's ownership of the firearm, so the parties' arguments on appeal focus on whether there was sufficient evidence that he constructively possessed the rifle. Based on its determination that defendant's conduct of selling the rifle he owned to the pawnbroker was "entirely subsumed within an ownership theory" of FIP, the majority concludes that there was no evidence of constructive possession. 349 Or App at 504.

I disagree with the majority's conclusion. The word "possession" in ORS 166.270(1) includes constructive possession, so when a felon sells a firearm they own, the felon can be found to have committed the crime of FIP under a possession theory so long as there is evidence that the felon is exercising dominion or control over the firearm. Here, during the sale of the rifle that he owned, defendant did just that. Among other things, defendant was exercising a restraining or directing influence over the rifle when he told

his cousin she had retrieved the correct firearm from the safe, when he directed his cousin to hand the rifle to the pawnbroker, when he told the pawnbroker that he was the legal owner of the rifle, when he agreed to transfer the rifle to the pawnbroker for a specified price, and when he completed the sales transaction. There was also testimony from the pawnbroker that if defendant had cancelled the transaction, she would have given him the rifle, and he would have been free to leave with it, which shows that he had dominion and control over the rifle up to the point that the transaction was completed. Although defendant never touched the rifle during the transaction, in my view, his conduct of selling the rifle he owned to the pawnbroker falls squarely within a constructive possession theory of the crime of FIP.

To view defendant's conduct as constructive possession does not render any part of ORS 166.270(1) mere surplusage: ownership and possession remain different concepts, and a person can own something without possessing it. But they are also "related and overlapping concepts." *Casey*, 346 Or at 58. Having reviewed the majority opinion's construction of ORS 166.270(1), which relies in part on dictionary definitions that postdate the enactment of the statute, I am not persuaded that the legislature would have viewed a felon's act of selling their firearm as excluded from a constructive possession theory of FIP, especially given the 1971 revisions to the Criminal Code. *See* Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 3, 4 (July 1970) ("'[P]ossess' is a term appearing frequently in the draft and has been defined to include the doctrine of constructive possession of property.").

Here, viewing the evidence in the light most favorable to the state, *State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995), there was sufficient evidence to conclude that defendant was exercising dominion and control over the rifle when he sold it, and therefore sufficient evidence of constructive possession. As a result, the trial court did not err in denying the MJOA and allowing the jury to decide whether defendant committed the crime of FIP.

Because I would not reverse on that ground, I also address defendant's other arguments.

B.  *The Choice-of-Evils Defense*

Turning to defendant's argument that the trial court erred in denying his MJOA on the choice-of-evils defense, I conclude that the trial court did not err.

Subject to certain exceptions, conduct that would otherwise constitute an offense "is justifiable and not criminal" when it "is necessary as an emergency measure to avoid an imminent public or private injury" and "[t]he threatened injury is of such gravity that, according to ordinary standards of intelligence and morality, the desirability and urgency of avoiding the injury clearly outweigh the desirability of avoiding the injury sought to be prevented by the statute defining the offense in issue." ORS 161.200(1).

Under the choice-of-evils defense, the defendant must have "'no reasonable alternative but to commit the crime.'" *State v. Clowdus*, 326 Or App 36, 43, 530 P3d 525 (2023) (quoting *State v. Phillips*, 317 Or App 169, 175, 503 P3d 1282 (2022)). The threatened injury must be imminent, and "it must be reasonable for the defendant to believe that the need to avoid the threatened injury outweighed the injury that the violated statute seeks to prevent." *Clowdus*, 326 Or App at 43.

I understand defendant's contention that he may have been attempting to rid himself of the firearm because of his status as a felon. However, defendant's cousin testified that defendant wanted to sell the rifle because he was "out of cash."

Viewing that evidence in the light most favorable to the state, it was for the jury to decide whether defendant reasonably believed that he needed to take the rifle to the pawnshop to avoid a threatened injury or whether he did so simply because he wanted the money. In addition, there was some evidence of reasonable alternatives to taking the rifle to the pawnshop because defendant could have asked his probation officer or law enforcement what to do with it, and the detective testified that if defendant had contacted

the police department, the detective would have "cut him a break."

The trial court did not err in allowing the jury to decide whether defendant's conduct was justified under the choice-of-evils defense.

## C. *Probation Violation*

In his second assignment of error, defendant relies on the same arguments about constructive possession and the choice-of-evils defense to argue that the trial court erred in determining that he violated the conditions of his probation. "Whether there is sufficient evidence in the record to satisfy the state's burden" to prove that a defendant violated a condition of probation presents "a legal question." *State v. Stroud*, 293 Or App 314, 318, 428 P3d 949 (2018).

Here, there was no legal error in the trial court's determination that defendant violated the terms of his probation. The evidence in the record was sufficient for the trial court to determine that defendant failed to obey all laws by committing the crime of FIP. As already explained, there was evidence that defendant exercised dominion or control over the rifle by directing his cousin to take it to the pawnshop and by selling it to the pawnbroker, and there was also evidence that he did so because he wanted to sell the rifle rather than, for example, give it to the police. Although I have some reservations about the state's decision to pursue probation revocation based on defendant's sale of his rifle,[3] focusing on the legal question presented to this court, I believe the evidence was sufficient for the trial court to conclude that defendant violated a condition of his probation by failing to obey all laws.

---

[3] Although felons who sell firearms they own can be prosecuted for FIP, whether they should be is another matter. ORS 166.250 and ORS 166.255 describe a range of circumstances under which it is unlawful for a person to knowingly possess a firearm or ammunition, and such persons are required to transfer all firearms and ammunition in their possession to a local law enforcement agency, to a gun dealer, or to a third party who does not reside with the person within 24 hours. ORS 166.256(2)(a), 166.259(2)(a). Similarly, persons subject to an extreme risk protection order must surrender deadly weapons within 24 hours of issuance of the order. ORS 166.537. The parties have not pointed us to a similar option for persons who are convicted of felonies and who owned or possessed firearms before the date of their felony convictions.

D.   *Attorney-Client Privilege*

In his third through fifth assignments of error, defendant argues that the prosecutor improperly inquired into privileged subject matter when she sought to elicit testimony from defendant that he did not contact an attorney about how to lawfully dispose of the rifle. I am not persuaded by those arguments.

We review a trial court's rulings on the attorney-client privilege for errors of law. *State v. Taylor*, 247 Or App 339, 341, 268 P3d 795 (2011). Having reviewed the challenged testimony, I assume without deciding that the trial court erred in allowing testimony about whether defendant contacted an attorney, but I also conclude that the error was harmless. To show that the choice-of-evils defense did not apply, the prosecutor sought to establish that there were other ways to lawfully dispose of the rifle that defendant did not pursue or explore. But defendant's failure to contact an attorney was not the only basis for the jury or the trial court to determine that the choice-of-evils defense did not apply. There was also evidence that defendant took the rifle to the pawnshop because he wanted to be paid for it and that he failed to ask his probation officer or law enforcement about how to lawfully dispose of it. Therefore, the error, if any, in allowing questions about defendant's communications with his attorney had little likelihood of affecting either the jury's verdict or the decision to revoke probation because there was evidence that defendant wanted cash for rifle and he did not reach out to his probation officer or law enforcement before taking it to the pawnshop.

E.   *Testimony About a Legal Conclusion*

In his sixth and final assignment of error, defendant argues that the trial court erred when it permitted the detective to provide testimony in the form of a legal conclusion. I agree with defendant that it was error to permit the testimony.

During the state's examination of the detective, after asking the detective about his experience, the following exchange occurred:

"Q   * * *   And—and as a result of that, how familiar are [you] with the laws regarding felons in—being in possession

of firearms, people carrying concealed weapons, how trans-
fers can occur, those kinds of things?

"A   I can't recite ORSs, but I have an understanding of
them, yes.

"Q   Okay. And have you ever had to explain to people or
*** in a sense, advise people about things like that?

"A   Yes.

"Q   Okay. And are you familiar—I don't need you to recite
it, but are you familiar with the statute about how a person
can lawfully transfer ownership of—of their weapon?

"A   Yes.

"Q   Okay.

"A   Yes.

"Q   And if somebody needed to get rid of a weapon, let's
say because they're a felon, is there—could—could a family
member—could it be transferred to a family member?

"A   Yes.

"Q   Okay."

Defendant objected on the ground that the tes-
timony improperly called for a legal conclusion. The trial
court overruled the objection. The prosecutor then asked:

"Q   Is a person able to transfer a firearm some other way
other than having to do it themselves?

"A   Yes.

"Q   And—and in what ways?

"A   If they're family, they can just have the gun.

"Q   Okay. Transfer it to a family member.

"A   Uh-hum.

"Q   Okay. Thank you.

"A   And there's a specific list.

"Q   Of what constitutes family?

"A   Yeah.

"Q   Does that include a cousin?

"A   It does. First cousin.

"Q   Okay. And is that pursuant to a particular statute?

"A   It is.

"Q   And do you have that with you?

"A   I do, actually.

"Q   And could you tell us what that is?

"* * * * *

"A   Oregon Revised Statutes. It's 166.435."

On appeal, defendant argues that the trial court erred in permitting the detective to testify about a legal conclusion. The state responds that the detective merely described a statute, and he did not offer a legal opinion or apply the law to the facts. The state also argues that the detective was merely describing what he would have told someone if they had asked him about how to lawfully dispose of a weapon. I am not persuaded by the state's arguments.

In general, it is not permissible for a witness, expert or otherwise, to offer "a legal opinion on whether certain statutory elements had been met under the circumstances." *State v. Woodford*, 293 Or App 484, 490, 428 P3d 971 (2018). In *Woodford*, a case in which the defendant claimed self-defense, a police chief testified that, having reviewed a video recording of the incident, he "saw no elements of a crime being committed" by the victim. *Id.* at 487. We explained that the testimony was impermissible because the police chief "offered a mixed legal and factual conclusion" about the victim's conduct, and it "implicitly conveyed the understanding that, in his expert opinion, it was all but legally impossible that [the] defendant acted in self-defense." *Id.* at 489.

Similarly, in a tort case arising from an accident at a construction site, we determined that the trial court erred when it allowed a witness to testify that the signage at the construction site complied with "whatever the requirements were." *Olson v. Coats*, 78 Or App 368, 370, 717 P2d 176 (1986). And, in a tort case arising from a vehicle collision in a school zone, we held that the trial court properly excluded expert testimony from a police detective who would have testified

that he would not have issued the plaintiff a citation for a violation of the relevant statute. *Stokes v. Lundeen*, 168 Or App 430, 433-34, 7 P3d 586, *rev den*, 331 Or 283 (2000).

Here, the trial court ought to have sustained the objection to the detective's testimony. Notably, ORS 166.435 does not refer to a "felon," so when the detective relied on that statute as part of a discussion of how a felon could transfer a firearm to a family member, the detective was not merely citing or describing the statute. The flavor of the exchange with the prosecutor was that of a more thorough and fulsome discussion in which the detective applied the statute to the facts, especially given the emphasis on how a firearm can be transferred to a first cousin. *See* ORS 166.435(4)(c)(H). The testimony would have left the jury with the impression that defendant, a convicted felon, could—and should—have transferred the rifle to a family member or to his cousin, rather than taking it to a pawnshop to sell it.[4] The detective's testimony conveyed the message, at least implicitly, that defendant's conduct in selling the weapon at the pawnshop was unlawful. *See Woodford*, 293 Or App at 489 (explaining that it was an error to allow a police chief's testimony that implicitly conveyed his understanding that the defendant had acted unlawfully). Therefore, the trial court erred in permitting the testimony.[5]

Defendant argues that the error was not harmless because it likely affected the jury's verdict. I agree, especially given that the detective was presented to the jury as experienced in law enforcement matters. *See State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (explaining that an evidentiary error is not harmless when we cannot say that "there was little likelihood that" it "affected the jury's verdict"); *see also State v. Brown*, 297 Or 404, 439, 687 P2d 751 (1984) (explaining that, when expert testimony is introduced on a subject, there can be a danger that the jury "may be overly impressed or prejudiced by a perhaps misplaced aura of reliability or

---

[4] I offer no opinion on whether ORS 166.435 was intended as a way for felons to lawfully transfer their firearms, which the parties do not argue on appeal.

[5] Under OEC 704, testimony that offers an opinion on an ultimate issue to be decided by the trier of fact is sometimes admissible. However, as explained by the trial court when deciding whether to allow a jury instruction on ORS 166.435, it would likely have been confusing to interject that issue into the case.

validity of the evidence," thereby leading the jury to "abdicate its role of critical assessment"). The central issue in the case was whether defendant was a felon in possession of a firearm, and, if the jury accepted the detective's testimony about how a felon could lawfully transfer a firearm to a cousin, then it would have made the jury more likely to conclude that defendant's conduct in selling the rifle at a pawnshop was unlawful. Because the error in allowing the detective to offer a legal conclusion was not harmless, I would reverse and remand the judgment of conviction for FIP on that ground.

However, under the sixth assignment of error, defendant does not seek reversal of the judgment revoking his probation. I agree with defendant that the error he identifies in his sixth assignment requires reversing only the FIP judgment of conviction. That is because, when discussing the jury instructions, the trial court declined to provide an instruction on ORS 166.435 and indicated that it did not think that statute "pertain[ed]" to the FIP statute and that it would be "confusing" for the jury to be instructed on ORS 166.435. Therefore, the record indicates the trial court did not rely on the detective's testimony about ORS 166.435 when it revoked defendant's probation.

Instead, when doing so, the trial court relied on the evidence that defendant took the rifle to the pawnshop because he wanted to get money for it. Thus, under the specific procedural history of this case, defendant does not seek reversal of the judgment revoking probation under the sixth assignment of error, and the trial court's error in allowing the detective to testify about a legal conclusion is thus grounds for reversing the judgment of conviction, but not for reversing the judgment revoking probation.

Accordingly, I would reverse and remand defendant's judgment of conviction on the ground that the error in permitting testimony about a legal conclusion was likely to have affected the jury's verdict. But, I would not reverse either the judgment of conviction or the probation revocation judgment on the ground relied on by the majority; namely, that defendant's conduct was "subsumed within an ownership theory" of FIP.

I therefore respectfully concur in part and dissent in part.